IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**EXHIBIT A**

| | | |
|---|---|---|
| GANDA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION FILE |
| | ) | NO. 1:04-CV-1879-CC |
| YANGTZE OPTICAL FIBRE AND | ) | |
| CABLE COMPANY, LTD. and | ) | **AFFIDAVIT OF JOHN EDWARD** |
| DRAKA TECHNOLOGIES, N.V., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

I, the undersigned, John Edward, hereby solemnly swear and affirm the following:

1. I am the only member of Ganda, LLC, a limited liability company ("Ganda").

Minimum Contacts with the
United States As A Whole

2. While working with Ganda, YOFC signed contracts for the sale of in excess of $70 million dollars worth of fiber into Georgia, Virginia, the Carolinas, Kentucky and Connecticut from 1998 through 2003. The bulk of these contracts were signed by YOFC with at least three different clients: Lucent Technologies, Inc.(Georgia), OCC (Virginia) and BICC (Kentucky and Connecticut). All of Ganda's breach of contract and antitrust claims in this litigation arise out of these contracts.

3. Ganda undertook substantial marketing operations in the United States on behalf of YOFC, including attendance at trade shows, one-on-one client meetings, and the like. YOFC also undertook marketing operations through its own personnel in the United States, sending its employees (either in cooperation with Ganda or alone) to the United States to visit with the above-referenced clients, make sales pitches, negotiate/sign contracts for orders of fiber and attend industry conferences. For example, YOFC regularly sent representatives to the Optical Fiber Conference ("OFC") held annually in the US, including the one held in Baltimore, Maryland (2000); Anaheim, California (2001 and 2002); Atlanta, Georgia (2003) and Los Angeles, California (2004). At the 2003 and 2004 conferences YOFC jointly sponsored a booth with Draka Technologies, N.V., Draka Fibre Technology, B.V., or one of their affiliated fiber-making entities (collectively "Draka"). YOFC also sent its employees to the International Wire and Cable Society ("IWCS") trade show in Atlantic City, New Jersey, in November 2000, and to the subsequent IWCS trade shows in Orlando, Florida (2001 and 2002) and Philadelphia, Pennsylvania (2003). Draka also sent representatives to these IWCS trade shows. Draka and YOFC sent representatives to the Kessler Marketing Institute fiber conference held each fall in Newport, Rhode Island in order to

Case 1:04-cv-00474-ML-LDA Document 27-3 Filed 10/04/2005 Page 3 of 43

learn about the US market in order to be able to sell their products to American customers.

4. Draka (and/or its predecessor Plasma Optical Fibre, B.V., hereafter collectively "Draka") and YOFC's joint sponsorship of sales booths at these trade shows gave them the opportunity to exchange information on the market and customer activities, meet customers together and to confirm sales quantities and prices to certain customers.

5. Draka sent its employees to meet with clients and negotiate/execute contracts in the United States (said contracts to be performed in the US). Draka was an established supplier, in the 1998-2003 timeframe, to: Lucent Technologies, Inc.'s facility in Norcross, Georgia; OCC in Roanoke, Virginia; Chromatic Technologies in Massachusetts and several customers in the Carolinas. In the period 1998/99, before Ganda captured this business for YOFC, Draka was an established supplier to the Lucent facility in Norcross, Georgia. Ganda's success in wresting this business away from Draka for YOFC was part of the provocation for Draka's writing the "kill Ganda" letter of January 22, 1999.

6. In late October, 1998, a senior manager of Draka's predecessor Plasma Optical Fibre, B.V. ("POF") visited me in my hometown of Wilmington, North Carolina. His stated purpose was to purchase my interest in Ganda. He indicated at the time that

POF wanted to control YOFC's sales into the North American market and that this was his motive for "buying me out." See Letters from POF/Draka offering buyout, attached as Exhibit A-1.

7. As a result of my refusal to be bought out, Draka's predecessor POF contracted with a trucking company to warehouse their fiber in the United States for delivery to American customers. This operation was known as the Yellow Trucking Company and based in New Jersey. This operation was designed to enable Draka to compete with Ganda's US-based delivery capability. See Exhibit A-1.

8. Upon information and belief, POF was in 1998 a 100% wholly-owned subsidiary of Draka Holdings, N.V. It is my understanding that it was later renamed Draka Fibre Technologies (still 100% owned by Draka Holdings, N.V.). It is my understanding that it has more recently become part of Draka Comteq, a joint venture incorporating all of the worldwide optical fiber and cable activities of Draka and a French company, Alcatel (a fiber manufacturer and telecommunications conglomerate). Upon information and belief this joint venture is owned by Draka Holdings, N.V. and this joint venture now owns the 37.5% interest of Draka in YOFC. It has a significant and established presence in the US which includes several facilities which manufacture fiber optical cable.

<u>Minimum Contacts With Georgia</u>

Case 1:04-cv-01879-GC Document 35-3 Filed 08/02/2005 Page 5 of 42

9. On January 21, 2001, I met in Atlanta, Georgia with another Ganda employee, Syed Mustafa, and with YOFC's sales manager, Yan Chang Kun. The purpose of our meeting was to prepare for and facilitate final negotiations with representatives of Lucent Technologies, Inc.(Norcross), concerning Lucent's purchase of 62.5 micron multimode optical fiber from YOFC during the period January 1, 2001, through December 31, 2003.

10. After several days of negotiations, the Lucent/YOFC contract was finalized in Norcross and executed on behalf of Lucent in Norcross on January 26, 2001, by Scott T. Searles, Director. See Letter from Searles thanking Yan Chang Kun for his "leadership" during these negotiations, attached as Exhibit A-2. This contract, as with previous Lucent contracts, was to be performed entirely in Norcross, Georgia.

11. Searles forwarded the contract to YOFC in China, see Ex. A-2, and it was executed by YOFC's general manager, Xu Xizhou, a week later on February 3, 2001, with no material changes.

12. Approximately 60,000 kilometers of fiber was shipped from YOFC to Lucent under this contract. Under the terms of the Agreement signed in April, 2001 between YOFC and Ganda, Ganda was due a commission of $5 per kilometer of fiber. YOFC failed to advise Ganda of these shipments and the commissions due

within the terms of the YOFC/Ganda agreement, which commission amounted to $300,000. The past due commission is a part of Ganda's claims in the current lawsuit.

13. The total amount of fiber which was to have been shipped under the Lucent/YOFC contract was 300,000 kilometers with a value of $32,000,000. A commission of $1.5 million is due and is a part of Ganda's claims in this litigation.

14. As noted above, in the period 1998/99, before Ganda captured this business for YOFC, Draka's predecessor POF was an established supplier to the Lucent facility in Norcross, Georgia. Ganda's success in securing this business, which subsequently amounted to over $70 million in orders for YOFC, was part of the provocation for POF/Draka's writing the "kill Ganda" letter of January 22, 1999, as well as the motivation for Draka's subsequent efforts to put Ganda out of business.

(SIGNATURE NEXT PAGE)

I, JOHN EDWARD, HAVE READ THE FOREGOING AFFIDAVIT AND DO SOLEMNLY SWEAR THAT THE FACTS CONTAINED THEREIN ARE TRUE AND CORRECT TO THE BEST OF MY OWN PERSONAL KNOWLEDGE, EXCEPT WHERE OTHERWISE STATED. FURTHER AFFIANT SAYETH NOT.

JOHN EDWARD

SWORN TO AND SUBSCRIBED before me
this 27 day of July, 2005.

Notary Public
My Commission Expires:

(SEAL)

Lucent Technologies
Bell Labs Innovations

Supply Network Solutions

Suite C110
2000 Northeast Expressway
Norcross, GA 30071

January 26, 2001

Yangtze Optical Fibre and Cable Co. Ltd.
Mr. Yan Chang Kun
4 Guan Shan Er Road
Wuhan, China 430073

Dear Mr. Chang Kun,

First and foremost, thank you for your leadership in completing the next step in our business together. Please be advised that in consideration of our growing relationship I am honoring your request for a signed contract as we discussed in my office. Please sign both copies and have one returned to Mr. Ed Watson.

Secondly, I greatly appreciate your taking the time to hear my request for an additional 100 FMm of Multi-mode through a priced swap of the same volume of Lucent's Truewave ® fiber. As discussed, YOFC would be allowed to sell this in cable form in China without restriction. At this time, I have the Truewave ® reserved and respectfully request your involvement in discussions to make this agreement.

To that end, I am available in Norcross through February 6th. Also, I have cleared my schedule on February 12th in Tokyo if that is more convenient.

I am grateful that we have joined hands and hearts in this manner and anxiously await your call to discuss the 100 FMm swap.

Best Regards,

Scott Searls
Director,
Lucent Atlanta Facility SNS

PLAINTIFF'S EXHIBIT
AI

Aug. 02 2005 12:51PM P1 FAX NO. : 9107918472 1@ec.rr.com

# plasma optical fibre

Plasma Optical Fibre B.V.
Bedrijventerrein "de Beuk"
Zwaanstraat 1
5651 CA Eindhoven
The Netherlands
P.O. Box 1136
5602 BC Eindhoven
The Netherlands

# FAX

**To:**
F.a.o. John Edwards
Faxnumber: 00 1 910 790 9253

**Telephone**
++ 00 40 2923872
**Telefax**
++ 00 40 2923875

**From:** A. van Beinum

**Copy:**

**Ref.:** **Number of pages: 1** (incl. this one) **Date:** 09-11-98

**Subject:** Your fax this morning

dear John,

I do not know what I should keep confidential. It is not our policy to discuss business in detail with third parties. Do not ask me to deny the existence of Ganda or the relationship that Ganda has in our regular business with fibres towards all of our customers in the USA. This relationship is non existing as well for YOF-C as for POF.

As to your remark about two warehouses I kindly remind you that all existing customers from YOF-C and POF are only serviced from one location and that is not Ganda.

I have made you an offer last week and this is still valid. But be aware that we are signing a contract for the warehouse tomorrow or day after tomorrow. So if you like to reconsider, be fast!

Regards,

Ariën van Beinum

PLAINTIFF'S EXHIBIT A2

Ref.

# plasma optical fibre

Plasma Optical Fibre B.V.
Bedrijventerrein "de Beuk"
Zwaanstraat 1
5651 CA Eindhoven
The Netherlands
P.O. Box 1136
5602 BC Eindhoven
The Netherlands

Telephone
+31 40 2923 870
Telefax
+31-40-2923 875

## FAX

**To:**

F.a.o. Mr. John Edward
Faxnumber: 1-910-790-9253

**From:** Ariën van Beinum

**Copy:**

**Ref.:** GM98/1194 **Number of pages: 2** (incl. this one) **Date: 28-10-98**

**Subject:** Warehouse proposal

Dear John,

We received your fax concerning the warehouse proposal.
Based on the information in this fax we have a severe problem in accepting your proposal.

We received from two other companies quotations which involved similar services. One of these quotations was offering the services for US $ 33.000,- per year and the other for US $ 27.000,- per year.
This makes it impossible to accept your proposal of US $ 280.000,- for these services.

Next to this financial problem we have a more principal problem:
All parties at our side (Draka Holding, YOF-C and POF) have the opinion that first there should be an agreement over the purchase price of the warehouse and that only thereafter we should start using the warehouse.

At this moment we are doing further investigations in establishing a warehouse in the US by using shipping companies. We expect to be able to make a final go/no go decision by the middle of next week.

In the meantime we like you to consider again to sell us the warehouse operation. We are willing to improve our original offer and therefor we like to make the following proposal:

- For the complete inventory including computer equipment and related software and for all other assets of the warehouse operation in Cranston, including all the initial costs which have been made to start this operation we are offering to pay US $ 200.000,- in total.

- We are offering you a consultancy contract for a period of 4 years with an annual fee of US $ 50.000,-.

We hope that you will find the above mentioned offer attractive enough to reconsider your decision.
We still are very interested to obtain control and property of the Ganda warehouse and we trust that we can use this warehouse to our benefit also for more marketing oriented purposes in the future.

Awaiting your messages with interest,

with kind regards,

Ariën van Beinum

Copy: John Cain

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUN 28 2004

LUTHER D. THOMAS, Clerk
By: [signature] Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| Ganda, LLC<br><br>Plaintiff,<br><br>vs.<br><br>Yangtze Optical Fibre and Cable Company, Ltd. and Draka Technologies, N.V. f/k/a Plasma Optical Fiber, N.V.<br><br>Defendants. | ) | Civil Action No.<br><br>**1 04-CV 1879**<br>**COMPLAINT**<br>**(Jury Trial Requested)**<br><br>**SECOND ORIGINAL** |

Plaintiff, complaining of the above-named Defendants, would respectfully show unto the Court as follows:

## JURISDICTION

1. Plaintiff Ganda, LLC ("Ganda") is a limited liability company organized and existing under the laws of the State of Delaware which had a principal place of business located in Cranston, Rhode Island.

2. Upon information and belief, Defendant Yangtze Optical Fibre and Cable Company, Ltd. ("YOFC") is a corporation organized and existing under the laws of the People's Republic of China with a principal place of business located in Wuhan, China.

3. Upon information and belief, Draka Technologies, N.V. f/k/a Plasma Optical Fiber, N.V. ("POF") is a corporation organized and existing under the laws of the Netherlands with a principal place of business located in the Netherlands. Further, upon information and belief, Draka Technologies, N.V. f/k/a Plasma Optical Fiber, N.V. is a wholly-owned subsidiary of Draka Holdings, N.V. Draka Holdings, N.V. is a minority stock holder in YOFC.

4. This Court has subject matter jurisdiction over the within action pursuant to 28 U.S.C. §§ 1331, 1332 and 15 U.S.C. §§ 15 and 22.

PLAINTIFF'S EXHIBIT
A

Case 1:04-cv-01879-LDA Document 35 Filed 12/20/2004 Page 2 of 42

**FACTUAL ALLEGATIONS**

5. YOFC is a manufacturer of fiber optical products. At all times relevant to this action, Ganda was engaged in the business of promoting and selling fiber optical products on behalf of YOFC.

6. Ganda and YOFC formed a business relationship in 1998 with the execution of an agreement entitled "Agreement Between YOFC and Ganda," with an accompanying Addendum entitled "Clarification and Additions to Agreement" (collectively, the "Original Agreement"). The Original Agreement was valid until April 30, 2001. A copy of the Original Agreement is attached as Exhibit A.

7. On or about February 1, 2000, the parties executed an agreement to extend the Original Agreement until April 30, 2003 (the "February 1st Extension").

8. The Original Agreement designated Ganda to be an exclusive sales agent for YOFC products in North America, Japan and certain other global markets. Pursuant to the Original Agreement, as extended by the February 1st Extension, Ganda established and serviced markets for YOFC's fiber optic products in North America and other markets around the globe. Prior to Ganda's involvement, YOFC did not have a permanent established market position in North America. Ganda was to be compensated under these agreements by payment of a sales commission for orders received from customers for YOFC's optical products in North America and other designated markets.

9. As a result of Ganda's efforts, YOFC became established in the North American market with a permanent presence.

10. On April 6, 2001 Ganda and YOFC executed a new Agreement (the "April 6 Agreement"), which superseded the Original Agreement and the February 1st Extension.

11. At all times relevant to the respective agreements between the parties, Ganda worked diligently to provide services to YOFC in accordance with the terms of said agreements. Under these agreements, YOFC shipped tens of millions of dollars worth of fiber to a plant located in Norcross, Georgia operated by one of Ganda's North American clients, Lucent Technologies, Inc.

12. Despite Ganda's efforts to perform fully in accordance with the terms of the agreements, YOFC made no appreciable effort to support Ganda in the North American market. Specifically, YOFC circumvented Ganda's involvement and initiated and/or pursued direct negotiations with several of Ganda's customers with the intention to avoid paying sales commissions due Ganda under the terms of the agreements between the parties.

13. By letter dated July 18, 2002, Ganda advised YOFC that it considered YOFC's conduct to constitute constructive termination of the April 6 Agreement.

14. By facsimile dated August 5, 2002, YOFC, by and through its corporate representative, acknowledged receipt of Ganda's July 18, 2002 letter. YOFC also acknowledged its intention and desire to terminate the relationship between YOFC and Ganda.

**FOR A FIRST CAUSE OF ACTION AS TO YOFC ONLY**
**(Breach of Contract)**

15. The foregoing allegations are incorporated by reference to the extent they are consistent herewith.

16. In both the Original Agreement and the April 6 Agreement, YOFC agreed to coordinate with Ganda to develop the worldwide market for YOFC's fiber optic products. The Original Agreement and the April 6 Agreement constituted valid and binding contracts between Ganda and YOFC.

17. Despite its assurances to the contrary, YOFC repeatedly failed to perform as required under the terms of the subject agreements.

18. YOFC deliberately disregarded its agreement with Ganda by shipping at least 60,000 kilometers of fiber directly to Optical Cable Corporation ("OCC") in 2001 and 2002. YOFC failed to pay Ganda the commissions due on these shipments and possibly others.

19. In both the Orginal Agreement and the April 6 Agreement, and in various documents executed by YOFC, YOFC committed to "ship optical fiber products in keeping with customer orders and ship schedules to meet customer commitments and expectations." Parag. 3.1(b). YOFC breached this commitment by repeatedly short-shipping Ganda's clients.

20. YOFC also breached the Article 3 of the April 6 Agreement by failing to communicate with Ganda about its sales targets and strategies; to ship optical fiber products in keeping with customer orders; to provide timely updates on shipments; to provide information regarding the availability of fiber optic products to Ganda; and to timely respond to sales opportunities offered by Ganda.

21. In addition, YOFC failed to negotiate in good faith to extend the Agreement beyond April 2003, in violation of Article 9.3 and despite making repeated verbal and written assurances that it would so negotiate.

22. Article 11 of the April 6 Agreement provided that in the event that the relationship between Ganda and YOFC was terminated "for any reason, commissions will be payable to the date of termination and pro rated forward for 6 months beyond the date of any existing agreements."

23. Under Article 11 of the April 6 Agreement Ganda is entitled to commissions generated on any contract or commitment signed by YOFC with a Ganda client prior to the date of termination of the April 6 Agreement, July 31, 2002 (hereafter "Existing Contracts").

Case 1:04-cv-01879-CC Document 35 Filed 08/02/2005 Page 15 of 42

24. The amounts due Ganda from YOFC include not only commissions on orders actually shipped prior to July 31, 2002, but commissions generated following July 31 over the lifetime of any Existing Contracts.

25. Under Article 11, Ganda is entitled to commissions for six months beyond the date of the expiration of any Existing Contracts based upon the volume of sales generated by the Existing Contracts during their period of validity.

26. YOFC has failed to comply with its obligation as set forth in the April 6 Agreement.

27. YOFC's numerous breaches and failures to comply with the terms of the Original Agreement and the April 6 Agreement resulted in damage to Ganda, including lost commissions.

28. Ganda is entitled to recover all such damages from YOFC.

**FOR A SECOND CAUSE OF ACTION AS TO YOFC ONLY**
**(Breach of Contract Accompanied by a Fraudulent Act)**

29. The foregoing allegations are incorporated by reference to the extent they are consistent herewith.

30. At the time the parties entered into the April 6 Agreement YOFC represented to Ganda that it would perform in accordance with the terms of said agreement by providing fiber optical products to Ganda for sale and distribution to customers located in the United States.

31. In the April 6 Agreement, YOFC explicitly recognized that OCC was a Ganda customer.

32. At the time Ganda executed the April 6 Agreement, YOFC already had engaged in successful negotiations with at least one of Ganda's clients to provide fiber optical products. Nevertheless, YOFC failed to disclose its solicitation of such clients in order to induce Ganda to execute the April 6 Agreement.

33. At the same time YOFC was executing the April 6 Agreement with Ganda, YOFC already had secured a contract with OCC. Further, YOFC was shipping fiber products to OCC without Ganda's knowledge.

34. YOFC shipped products to OCC without disclosing such shipments to Ganda or paying commissions to Ganda.

35. YOFC's conduct violated Section 8.3 of the Agreement since it failed to forward certain required documents to Ganda regarding the sale of products to OCC.

36. Ganda executed the April 6 Agreement based on YOFC's representations and assurances that it would perform in accordance with the terms of said agreement by providing fiber optic cables and products to Ganda for sale to customers located in the United States.

37. YOFC's representations were false, as evidenced by its conduct in communicating and negotiating directly with customers located in the United States.

38. Ganda justifiably relied on YOFC's representations to its detriment. As a result of YOFC's representations, Ganda is entitled to recover all commissions due pursuant to the agreements, as well as such other actual and punitive damages that may be determined by the trier of fact.

**FOR A THIRD CAUSE OF ACTION AS TO ALL DEFENDANTS**
**(Tortious Interference With Contractual Relations)**

39. The foregoing allegations are incorporated by reference to the extent they are consistent herewith.

40. During the course of the business relationship between Ganda and YOFC, Ganda promoted YOFC's fiber optical products to Lucent Technologies, OCC and BICC/General. Ganda secured contracts with these customers for the sale of fiber optical products manufactured by YOFC.

41. YOFC was aware at all times of the existence of Ganda's relationships with Lucent Technologies, OCC, and BICC/General.

42. YOFC nevertheless directly solicited Ganda's clients to provide fiber optical products despite the fact that it had previously agreed that Ganda was responsible for negotiating with such clients. Upon information and belief, YOFC did so in part at the request or demand of POF. POF knew of YOFC's agreement with Ganda.

43. Ganda's contractual relations with its clients were severed as a direct result of YOFC's conduct in directly negotiating with such clients at POF's insistence.

44. As a result of YOFC's and POF's intentional interference with Ganda's contractual relations with the above-named customers, Ganda has suffered damages in the form of lost sales and commissions. Ganda is entitled to recover actual and punitive damages in amount to be determined by the trier of fact.

**<u>FOR A FOURTH CAUSE OF ACTION AS TO YOFC ONLY</u>**
**(Georgia Wage Payment Statute)**

45. The foregoing allegations are incorporated by reference to the extent they are consistent herewith.

46. The Original Agreement and the April 6 Agreement between Ganda and YOFC obligate YOFC to pay sales commissions to Ganda for sales of fiber optic cables and products to customers in North America..

47. Upon termination of the Agreement in July 2002, YOFC became obligated to pay all commissions due Ganda within thirty days of such termination.

48. Following termination of the Agreement, YOFC failed to pay commissions due Ganda in accordance with the terms of the Agreement.

Case 1:04-cv-04741-LCA Document 27-3 Filed 06/10/2005 Page 18 of 42

49. As a result of YOFC's failure to remit payment of commissions due Ganda following termination of the Agreement, YOFC is liable to Ganda for all commissions due pursuant to the Agreement, doubled in accordance with the terms of the applicable Georgia statute, together with attorney's fees associated with bringing this action. O.C.G.A. § 10-1-702.

**<u>FOR A FIFTH CAUSE OF ACTION AS TO ALL DEFENDANTS</u>**
**(Sherman Act)**

50. The foregoing allegations are incorporated by reference to the extent they are consistent herewith.

51. At all times relevant to this action, Ganda promoted and sold YOFC's products in North America.

52. Ganda and POF were competitors for the sale of fiber optical products in North American market during the time relevant to this action. POF and YOFC likewise competed with each other for the sale of fiber optical products in North America, including the United States, during the time relevant to this action.

53. The sale of fiber optical products in North America constitutes a relevant market for purposes of this cause of action.

54. On January 22, 1999, POF issued a demand in writing, by faxed letter, that YOFC assist it in "kill[ing] all commercial activities from Ganda towards our USA market." A copy of this letter is attached as <u>Exhibit B</u>. In that communication, POF complains that Ganda is competing against POF "with better prices."

55. YOFC acquiesced to POF's demand, which resulted in eliminating Ganda from the North American market for fiber optical products, as outlined above.

56. By eliminating Ganda from the market, POF and YOFC were able to control downward price pressure on fiber optic sales in the North American market.

Case 1:04-cv-01879-CC Document 35 Filed 08/02/2005 Page 19 of 42

57. Ganda was eliminated from the market as a result of the conspiracy between YOFC and POF, and the conspiracy had the anticompetitive effect of allowing POF and YOFC to control price pressure on fiber optics within North America.

58. The conspiracy between YOFC and POC to eliminate price competition from Ganda is per se illegal under § 1 of the Sherman Act, 15 U.S.C. § 1.

59. Alternatively, the conspiracy between YOFC and POF is an unreasonable restraint on competition within the relevant market described above, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

60. The actions of YOFC and POF have damaged Ganda as described above. Ganda is entitled to recover all such damages from the co-conspiratorial defendants, said damages to be trebled pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15.

**FOR A SIXTH CAUSE OF ACTION AS TO ALL DEFENDANTS**
**(Punitive Damages)**

61. The foregoing allegations are incorporated by reference to the extent they are consistent herewith.

62. The Defendants' actions, as described in the foregoing paragraphs, constituted willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

63. As a result of the Defendants' actions, Ganda is entitled to punitive damages in an amount to be determined by the trier of fact.

WHEREFORE, Ganda respectfully prays for judgment:

1. Against YOFC on its First Cause of Action, in an amount to be determined by the trier of fact;

2. Against YOFC on its Second Cause of Action, in an amount to be determined by the trier of fact, together with punitive damages;

3. Against YOFC and POF, jointly and severally, on its Third Cause of Action, in an amount to be determined by the trier of fact, together with punitive damages;

4. Against YOFC on its Fourth Cause of Action for all commissions due Ganda, doubled pursuant to OCGA § 10-1-702, together with attorneys' fees;

5. Against YOFC and POF on its Fifth Cause of Action, in an amount to be determined by a trier of fact, said amount to be trebled pursuant to 15 U.S.C. § 15, together with attorneys fees thereon; and

6. For such other and further relief as the Court deems just and proper.

H. Lee Pruett
Georgia State Bar No. 588920

Swift, Currie, McGhee & Hiers, LLP
1355 Peachtree Street, NE
Suite 300
Atlanta, GA 30309
404-888-6147
404-888-6199

and

James L. Rogers (Pro Hac Vice to be filed)
Natalma M. McKnew (Pro Hac Vice to be filed)
Jonathan D. Hammond
Leatherwood Walker Todd & Mann, P.C.
300 E. McBee Avenue #500, PO Box 87
Greenville, South Carolina 29602
(864) 242-6440/(864) 240-2477 (Fax)

Attorneys for Plaintiff Ganda, LLC

June 28, 2004

# plasma optical fibre

Plasma Optical Fibre B.V.
Bedrijventerrein "de Bruk"
Zwaanstraat 1
5651 CA Eindhoven
Nederland
Postbus 1136
5602 BC Eindhoven
Nederland

Telefoon
++ (0) 40 2923872
Telefax
++ (0) 40 2923879

## FAX

Aan: John Cain (home address)

Van: A. van Beinum

Kopie:

Ref.:

Aantal pagina's: 1 (incl. deze pagina)

Datum: 22-01-99

Betreft: ganda / kopstein **urgent urgent urgent urgent**

John,

jan willem visited weeks ago kopstern and booked the order for the first quarter of 1999. We informed you about that and discussed about transport. Until now we are chasing debbie and bob to get the formal order. With no success. Finally we have found out what happened.
After the visit of Plasma Optical Fibre (Jan Willem) Ganda contacted Kopstein and promised him a revised quotation with better prices!!!
OCC is confused and does not know how to react who is in charge?

For the time being kopstein has placed spot orders and does not give any long term commitment. J.W. will visit him again next week and will try to organise things in a proper way.

Please assist as follows:

aaa: kill all commercial activities from Ganda towards our USA market.

bbb: sent a fax to Kopstein in which you tell him that there might be rumours in the market that other people are representing YOF-C but that you can assure him that the only authorised sales organisation for the OCC account is the combined sales from YOF-C and Plasma via the Plasma Optical Fibre Sales and Marketing department represented by Jan Willem Leclerq.

Please contact me about this,
arien

my [illegible]
++ 31 35 60-18300



PLAINTIFF'S EXHIBIT B To Complaint

Contract # AT22010008
Page 1 of 15

LUCENT TECHNOLOGIES INC
Supply Network Solutions
2000 Northeast Expressway
Norcross, Georgia 30071

YANGTZE OPTICAL FIBRE AND
CABLE CO., LTD
4 Guan Shan Er Road
Wuhan 430073 P.R.C.

Lucent Technologies Inc. ("Company") agrees to purchase and Yangtze Optical Fibre and Cable Co., LTD ("Supplier") agrees to sell in accordance with the terms and conditions stated in this Agreement and any attachments to this Agreement.

MATERIAL - Such quantities (as specified in the article, QUANTITIES) of 62.5 micron multimode optical fiber of Supplier's manufacture (the "Material") as shall be ordered by Company during the period January 1, 2001 through December 31, 2003.

PRICE - Pricing for Material shall be as follows: $ 108.00 per kilometer. ↓ to $100.75

INCOTERMS - (DDP Cranston, RI). Changed to DDU Wuhan.. Lucent paid transport to Norcross.

SPECIFICATIONS - Material Specification No. MS63716, Issue 4, dated 4/18/2000, a copy of which is in Supplier's possession, as changed from time to time with Supplier's written approval, is made part of this Agreement.

TERMS OF PAYMENT - Net thirty (30) days from the date of receipt of invoices by Company. All invoices shall be prepared consistent with the requirements prescribed by Company in order to be accepted.

ATTACHMENTS - The following attachments are hereby made part of this Agreement:

Attachment A - Material Specification No. MS63716, Issue 4, Dated 4/18/2000
Attachment B - Packaging Specification OMS-7001, Issue 2, Dated 1/20/97
Attachment C – Lucent Technologies China Corporate Policy, Dated 1/19/99

ASSIGNMENT - Neither party shall assign any right or interest under this Agreement (excepting solely for moneys due or to become due) or delegate any obligation under this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld. Supplier shall be responsible to Company for all Work performed by Supplier's subcontractor(s) at any tier.

BEST PRICE - If, at any time during the term of this Agreement (i.e., January 1, 2001 through December 31, 2003), Supplier should sell to any customer other than to an affiliate or subsidiary of Supplier, Material at least equal or similar in quality at a price lower than that in effect hereunder, Company shall pay the



PLAINTIFF'S EXHIBIT B

lower price on all deliveries of Material which are made during the period when such lower price is in effect. Upon ten (10) days written notice, Company, or Company's authorized representatives, may audit Suppliers' applicable books and records for the purpose of verifying Supplier's compliance with this provision.

PRICE REVISION –Prices shall be updated every two calendar quarters by mutual agreement and in consideration of such factors as global market and regional market price trend changes for multimode fiber, change in production costs and other factors that may be mutually determined.

Any such revisions shall be agreed in writing at least thirty (30) days prior to such pricing taking effect and shall remain firm for at least two calendar quarters (except as provided in the section entitled BEST PRICE). If the parties fail mutually to agree to revised pricing, the most recently agreed price shall remain in effect.

QUANTITIES –

(a) Company commits to purchase from Supplier, and Supplier commits to sell to Company, the following minimum quantities of Material in each calendar year of this Agreement: in each of calendar years 2001, 2002, and 2003 no less than one hundred thousand (100,000) kilometers of Material. Company has the right to request volumes greater than noted above, subject to agreement in writing by Supplier. Company understands and agrees that it will not resell the Material purchased hereunder except in cable form, except that Company may resell such Material in any form to any of its affiliated entities, provided that such affiliated entities do not resell such Material except in cable form.

(b) Supplier shall provide to Company 100,000 km of Material during the calendar year 2001, at the rate of approximately 7,000 km per month for the first six months and at the rate of approximately 9,600 km per month for the second six months. Supplier shall deliver Material to Company in each of 2002 and 2003 at a rate of approximately 8,500 km per month. The monthly rates of delivery specified in this clause shall apply unless Material is otherwise ordered by Company pursuant to the article SCHEDULE.

(c) Any amounts of Material ordered by Company or any other ordering company as specified in the article ORDERING COMPANIES shall count toward satisfying its purchase obligations hereunder.

(d) Company's obligation to purchase the minimum quantities of Material stated herein shall be reduced: (1) to the extent that Supplier fails for any reason (not attributable to Company or Force Majeure) to accept a purchase order placed by Company for Material; (2) to the extent that Supplier fails for any

YOFC0002
CONFIDENTIAL



[3] 3-2

reason (not attributable to Company or Force Majeure) to deliver Material pursuant to the terms of this Agreement on the delivery date; (3) to the extent that Company rejects Material as specified in sub-section (e), below; and (4) to the extent that Company does not purchase any amount of Material as provided by the article, FORCE MAJEURE.

(e) Company may reject Material for failure to meet the Specifications or other requirements of this Agreement or to be delivered on time. If Company rejects Material, Company may, in addition to any of its other rights and remedies, (1) return rejected Material for full credit at the price charged plus transportation charges from the DDP point to Company's's plant and return from Company's plant to Supplier; or (2) accept a conforming part of any shipment; or (3) consider this Agreement breached to the extent of the quantity rejected; or (4) have rejected Material replaced by Supplier at the purchase price stipulated in this Agreement.

SCHEDULE – Company shall issue orders to Supplier on a quarterly basis with each order issued at least sixty (60) days prior to the first scheduled delivery request date. Each order will have quantities and delivery dates for Material scheduled on a monthly or more frequent basis. Company and Supplier shall meet at least quarterly to review shipments, deliveries, and payments.

CHOICE OF LAW - This Agreement and all transactions under it shall be governed by the laws of the State of New Jersey excluding its choice of laws rules and excluding the Convention for the International Sale of Goods. Supplier agrees to submit to the jurisdiction of any court wherein an action is commenced by Company in connection with this Agreement.

COMPLIANCE WITH LAWS - Supplier and all persons furnished by Supplier shall comply at their own expense with all applicable laws, ordinances, regulations and codes, including the identification and procurement of required permits, certificates, licenses, insurance, approvals and inspections in performance under this Agreement.

SETTLEMENT OF DISPUTES – Senior management of either party may, upon notice and within five (5) business days of receipt of a notice from the other party elect to utilize a non-binding resolution procedure whereby each presents its case before a panel consisting of two senior executives of each of the parties and if such executives can agree upon such an individual, a mutually acceptable neutral advisor. If a party elects to use the procedure set forth in this clause, the other party shall participate. The hearing shall occur no more than ten (10) business days after a party serves notice to use the procedure set forth in this clause. If the matter cannot be resolved by such senior executives, the neutral advisor, if one has been agreed upon, may be asked to assist such senior

YOFC0003
CONFIDENTIAL



13723

executives in evaluating the strengths and weaknesses of each party's position on the merits of their dispute. The parties shall each bear their respective costs incurred in connection with the procedure set forth in this clause, except that they shall share equally the fees and expenses of the neutral advisor, if any, and the cost of the facility for the hearing.

ENTIRE AGREEMENT - This Agreement shall incorporate the typed or written provisions on Company's orders issued pursuant to this Agreement and shall constitute the entire agreement between the parties with respect to the subject matter of this Agreement and the order(s) and shall not be modified or rescinded, except by a writing signed by Supplier and Company. Printed provisions on the reverse side of Company's orders (except as specified otherwise in this Agreement) and all provisions on Supplier's forms shall be deemed deleted. Estimates or forecasts furnished by Company shall not constitute commitments. The provisions of this Agreement supersede all contemporaneous oral agreements and all prior oral and written communications and understandings of the parties with respect to the subject matter of this Agreement.

FORCE MAJEURE - Neither party shall be held responsible for any delay or failure in performance of any part of this Agreement to the extent such delay or failure is caused by fire, flood, strike, civil, governmental or military authority, act of God, or other similar causes beyond its control and without the fault or negligence of the delayed or non-performing party or its subcontractors ("force majeure conditions"). If any force majeure condition occurs, the party delayed or unable to perform shall give immediate notice to the other party, stating the nature of the force majeure condition and any action being taken to avoid or minimize its effect. The party affected by the other's delay or inability to perform may elect to: (1) suspend this Agreement or an order for the duration of the force majeure condition and (i) at its option buy, sell, obtain or furnish elsewhere Material to be bought, sold, obtained or furnished under this Agreement or an order and deduct from any commitment the quantity bought, sold, obtained or furnished or for which commitments have been made elsewhere and (ii) once the force majeure condition ceases, resume performance under this Agreement or order with an option in the affected party to extend the period of this Agreement or an order up to the length of time the force majeure condition endured, not to exceed six (6) months, and/or (2) when the delay or nonperformance continues for a period of at least thirty (30) days, terminate, at no charge, this Agreement (including the parties' obligations to purchase and supply hereunder) or an order under this Agreement. Unless written notice is given within forty-five (45) days after the affected party is notified of the force majeure condition, (1) shall be deemed selected.

Notwithstanding the foregoing, a force majeure condition does not include currency fluctuations and no occurrence of a force majeure condition shall

YOFC0004
CONFIDENTIAL



(Σ) 2-4

relieve either party of its obligations to make any payment due hereunder. Adverse market conditions do not constitute a force majeure condition.

If by reason of a force majeure condition, Supplier's entire supply of the Material is insufficient to meet all of Supplier's commitments and requirements hereunder, Supplier shall have the right, at its option and without liability, to apportion its available supply among any and all purchasers, including Supplier's affiliated divisions and companies, in such manner as Supplier believes equitable, provided, however, that in that case Company shall be allocated no less than (a) the total amount of Material that Supplier supplies to unaffiliated third parties during the period of such shortfall multiplied by (b) a fraction, the numerator of which is Company's total purchases of Material from Supplier for the six (6) month period immediately preceding such shortfall, and the denominator of which is Supplier's total sales of Material to unaffiliated third parties during the same period, such allocation not to exceed the applicable Minimum Quantities hereunder.

If by reason of a force majeure condition, Company's entire purchases of the Material are insufficient to meet all of Company's commitments and requirements hereunder, Company shall have the right, at its option and without liability, to apportion its available purchases among any and all suppliers, including Company's affiliated divisions and companies, in such manner as Company believes equitable, provided, however, that in that case Supplier shall be allocated no less than (a) the total amount of Material that Company purchases from unaffiliated third parties during the period of such shortfall multiplied by (b) a fraction, the numerator of which is Supplier's total sales of Material to Company for the six (6) month period immediately preceding such shortfall, and the denominator of which is Company's total purchases of Material from unaffiliated third parties during the same period, such allocation not to exceed the applicable Minimum Quantities hereunder.

HEAVY METALS AND/OR CFC IN PACKAGING - Supplier warrants to Company that no lead, cadmium, mercury or hexavalent chromium have been intentionally added to any packaging or packaging component (as defined under applicable laws) to be provided to Company under this Agreement and that packaging materials were not manufactured using and do not contain chlorofluorocarbons. Supplier further warrants to Company that the sum of the concentration levels of lead. cadmium, mercury and hexavalent chromium in the package or packaging component provided to Company under this Agreement does not exceed 100 parts per million. Upon request, Supplier shall provide to Company Certificates of Compliance certifying that the packaging and/or packaging components provided under this Agreement are in compliance with the requirements set forth above in this clause

YOFC0005
CONFIDENTIAL



12 25

IDENTIFICATION - Supplier shall not, without Company's prior written consent, engage in publicity related to this Agreement, or make public use of any Identification in any circumstances related to this Agreement. "Identification" means any semblance of any trade name, trademark, service mark, insignia, symbol, logo, or any other designation or drawing of Lucent Technologies Inc. or its affiliates. Supplier shall remove or obliterate any Identification prior to any use or disposition of any Material rejected or not purchased by Company.

INDEMNITY - At Company's request, Supplier agrees to indemnify, defend and hold harmless Company, its affiliates, customers, employees, successors and assigns (all referred to as "Company") from and against any losses, damages, claims, fines, penalties and expenses (including reasonable attorney's fees) that arise out of or result from: (1) injuries or death to persons or damage to property, including theft, in any way arising out of or caused or alleged to have been caused by the Work or services performed by, or Material provided by Supplier or persons furnished by Supplier; (2) assertions under Workers' Compensation or similar acts made by persons furnished by Supplier; or (3) any failure of Supplier to perform its obligations under this Agreement.

INFRINGEMENT - Supplier shall indemnify and save harmless Company, its affiliates and their customers, officers, directors, and employees (all referred to in this clause as "Company") from and against any losses, damages, liabilities, fines, penalties, and expenses (including reasonable attorneys' fees) that arise out of or result from any and all claims (1) of infringement of any patent, copyright, trademark or trade secret right, or other intellectual property right, private right, or any other proprietary or personal interest, and (2) related by circumstances to the existence of this Agreement or performance under or in contemplation of it (an Infringement Claim). If the Infringement Claim arises solely from Supplier's adherence to Company's written instructions regarding services or tangible or intangible goods provided by Supplier (Items) and if the Items are not (1) commercial items available on the open market or the same as such Items, or (2) items of Supplier's designated origin, design or selection, Company shall indemnify Supplier. Company or Supplier (at Company's request) shall defend or settle, at its own expense any demand, action or suit on any Infringement Claim for which it is indemnitor under the preceding provisions and each shall timely notify the other of any assertion against it of any Infringement Claim and shall cooperate in good faith with the other to facilitate the defense of any such Claim.

INSURANCE - Supplier shall maintain all government required insurance contributions for its employees and all other insurance as is customary. Furthermore, Supplier shall provide Company with a copy of its insurance certificate, which shall be updated at regular intervals.

YOFC0006
CONFIDENTIAL



(3) 26

INVOICING FOR GOODS - Supplier shall: (1) render original invoice, or as otherwise specified in this Agreement, showing Agreement and order number, through routing and weight; (2) provide separate invoices for each shipment within twenty-four (24) hours after shipment; and (3) mail invoices with copies of bills of lading and shipping notices to the address shown on this Agreement or order.

ELECTRONIC DATA INTERCHANGE – Supplier agrees, if requested by Lucent, to implement "Electronic Data Interchange" (EDI) as an electronic means of trading business document with Lucent. The electronic business documents include purchase orders, acknowledgements, purchase order changes, ship notices, invoices, remittance advice, electronic funds transfer (EFT) or such purchasing communications as may be requested by Lucent for transactions under this Agreement. Supplier shall, at its sole expense, obtain, make fully operational and maintain all equipment, software and other materials set forth in Company's EDI Planning Guide. Supplier shall also execute an Electronic Purchasing Agreement with Company at the time of Lucent's request to initiate EDI as described in this clause.

PAYMENT TERMS - Invoices shall be paid in accordance with the terms in this Agreement, and due dates for payment shall be computed from the date of receipt of invoices by Company. Payment shall be made directly to Supplier by Company by wire transfer to the following account:

Bankers Trust Company, New York, U.S.A. for credit of Bank of Communications, Wuhan Branch, A/C No.: 04-167 385 (UID No.: 358175) with them in favour of Yangtze Optical Fibre and Cable Company Ltd. A/C No.: 86015[illegible]-14-5109808149

This account information may be changed upon thirty (30) days' prior written notice by Supplier to Company.

RIGHT OF ENTRY - Each party shall have the right to enter the premises of the other party during normal business hours with respect to the performance of this Agreement including an inspection or a Quality Review, subject to all plant rules and regulations, clearances, security regulations and procedures as applicable. Each party shall provide safe and proper facilities for such purpose.

SHIPPING - Supplier shall: (1) ship the Material covered by this Agreement or order complete unless instructed otherwise; (2) ship to the destination designated in the Agreement or order; (3) ship according to routing instructions given by Company; (4) place the Agreement and order number on all subordinate documents; (5) enclose a packing memorandum with each shipment and, when more than one package is shipped, identify the package containing

YOFC0007
CONFIDENTIAL



(2) 2-7

the memorandum; and (6) mark the Agreement and order number on all packages and shipping papers. Adequate protective packing shall be furnished at no additional charge. Shipping and routing instructions may be furnished or altered by Company without a writing. If Supplier does not comply with the terms of the INCOTERMS clause of this Agreement or order or with Company's shipping or routing instructions, Company has the right to deduct from any invoice of Supplier (or to charge back to Supplier), with prior verbal or written notice to Supplier, any increased costs incurred by Company as a result of Supplier's noncompliance.

SUPPLIER'S INFORMATION - Supplier shall not provide under, or have provided in contemplation of, this Agreement any idea, data, program, technical, business or other intangible information, however conveyed, or any document, print, tape, disc, semiconductor memory or other information-conveying tangible article, unless Supplier has the right to do so, and Supplier shall not view any of the foregoing as confidential or proprietary.

SURVIVAL OF OBLIGATIONS - The obligations of the parties under this Agreement, which by their nature would continue beyond the termination, cancellation or expiration of this Agreement, shall survive termination, cancellation or expiration of this Agreement.

TERMINATION OF AGREEMENT - In the event either party shall be in breach or default of any of the material terms, conditions, or covenants of this Agreement or any purchase order and such breach or default shall continue for a period of thirty (30) days after the giving of written notice to the breaching party thereof by the non-breaching party, then in addition to all other rights and remedies which the non-breaching party may have at law or equity or otherwise, the non-breaching party shall have the right to terminate this Agreement and/or purchase orders placed by Company without any charge to or obligation or liability of the non-breaching party by reason of such termination.

TITLE AND RISK OF LOSS - Title and risk of loss and damage to Material purchased by Company under this Agreement shall vest in Company when the Material has been delivered at the DDP point.

USE OF INFORMATION - Supplier shall view as Company's property any idea, data, program, technical, business or other intangible information, however conveyed, and any document, print, tape, disc, tool, or other tangible information-conveying or performance-aiding article owned or controlled by Company, and provided to, or acquired by, Supplier under or in contemplation of this Agreement (Information). Supplier shall, at no charge to Company, and as Company directs, destroy or surrender to Company promptly at its request any such article or any copy of such Information. Supplier shall keep Information

YOFC0008
CONFIDENTIAL



[2] 2-8

confidential and use it only in performing under this Agreement and obligate its employees, subcontractors and others working for it to do so, provided that the foregoing shall not apply to information previously known to Supplier free of obligation, or made public through no fault imputable to Supplier.

Both parties agree to keep confidential the contents of this Agreement, and not disclose such contents to any third party without the written consent of the other party, provided, however, that such contents may be disclosed:

(i) to such party's employees, employees of its affiliated entities, consultants, accountants, counsel, lenders and investors to whom such Agreement is needed to be disclosed in connection with the performance, evaluation, or enforcement of this Agreement and who have been instructed or have a duty to keep this Agreement confidential;

(ii) to the extent required pursuant to applicable law or any governmental authority;

(iii) to the extent required for purposes of enforcement; and

(iv) upon expiration of three (3) years after the termination of this Agreement.

This requirement to keep confidential the contents of this Agreement does not apply to Company with respect to any of the Attachments to this Agreement or any other of Company's Information that may be considered to be the contents of this Agreement, nor does it prevent Company from identifying Supplier as the manufacturer of the Material purchased hereunder.

WARRANTY - Supplier warrants to Company and its customers that Material furnished will be new, merchantable, free from defects in design, material and workmanship and will conform to and perform in accordance with the specifications, drawings and samples. These warranties extend to the future performance of the Material and shall continue for the longer of (i) eighteen (18) months from delivery of the Material by Supplier to Company at the DDP point, and (ii) twelve (12) months after cable containing the Material is delivered by Company to its customer. Supplier also warrants to Company and its customers that services will be performed in a first class, workmanlike manner. If Material furnished contains manufacturers' warranties, Supplier hereby assigns such warranties to Company and its customers. All warranties shall survive inspection, acceptance and payment. Material or services not meeting the warranties will be, at Company's option, returned for or subject to refund, repaired, replaced or reperformed by Supplier at no cost to Company or its customers and with transportation costs and risk of loss and damage in transit borne by Supplier. Repaired and replacement Material shall be warranted as set forth above in this clause. Except for personal injury (including death) and

tangible property damage, and except as otherwise provided by this Agreement, Company's sole remedies and Supplier's sole obligations for breach of the warranties provided in this Article shall be as stated in this Article.

BANKRUPTCY AND TERMINATION FOR FINANCIAL INSECURITY- Either party may terminate this Agreement by notice in writing:

1) if the other party makes an assignment for the benefit of creditors (other than solely an assignment of moneys due); or

2) if the other party evidences an inability to pay debts as they become due, unless adequate assurance of such ability to pay is provided within thirty (30) days of such notice.

NOTICES - Any notice or demand which under the terms of this Agreement or under any statute must or may be given or made by Supplier or Company shall be in writing and shall be given or made by confirmed facsimile, or similar communication or by certified or registered mail addressed to the respective parties as follows:

| | |
|---|---|
| To Company: | Lucent Technologies Inc.<br>Attention: Pat Pruitt, Suite C110<br>2000 Northeast Expressway<br>Norcross, GA 30071 |
| To Supplier: | Yangtze Optical Fibre and Cable Co., LTD<br>Attn: Dr. Xu Xizhou<br>4 Guan Shan Er Road<br>Wuhan 430073, P.R.C. |

The effective dates of such notice shall be (1) upon evidence of successful facsimile transmission, or (2) five days following the date mailed for certified or registered letters and two days following the date mailed for overnight letters, or (3) when delivered, if in person. The above addresses may be changed at any time by giving prior written notice as above provided.

DAY-TO-DAY CONTACT – The daily contacts for orders, shipment tracking, invoicing and other customer-service issues will be:

| | |
|---|---|
| To Company: | Lucent Technologies Inc.<br>Attention: Mr. Ed Watson<br>Tel: 770-798-5946 |



Lucent Technologies Inc. - Proprietary

12.2.10

To Supplier: Yangtze Optical Fibre and Cable Co., Ltd
c/o Ganda LLC
Attention: Mr. Syed Ahmed Mustafa
Tel: 716-872-7561

ORDERING COMPANIES - Lucent Technologies Inc. may order under this Agreement. In addition, any affiliated corporation, partnership, or venture, both U.S and foreign, as may be designated in writing by Lucent Technologies Inc., may order under this Agreement with Supplier's written consent, which shall not be unreasonably withheld. For the purpose of this Agreement, the term "Company" shall mean the corporation or other entity which enters into or issues a contract or order under this Agreement. An affiliated corporation, partnership, or venture is an entity, a majority of whose voting stock or ownership interest is owned directly or indirectly by Lucent Technologies Inc. Any contract or order issued under this Agreement will be a contractual relationship between the ordering Company and the Supplier and Supplier shall look only to the ordering Company for performance of the ordering Company's obligations under such contract or order.

PRODUCT CONFORMANCE - Supplier shall be responsible for providing to Company all Certified Test Data and any other information requested by Company to verify that Material meets Company's specifications. Supplier shall be responsible for sending the Certified Test Data information to Company's Representative or others as may be delegated in writing prior to Material being received by Company. Company's Representative shall be R. J. (Ron) Smith, Member of Technical Staff.

PRODUCT DOCUMENTATION - Supplier agrees to furnish, at no charge, product documentation, and any succeeding changes thereto, as described in Material Specification No. MS63716, Issue No. 4, dated 4/18/00 and attached as Attachment A. Company may use, reproduce, reformat, modify, and distribute such product documentation.

Company agrees to reproduce Supplier's copyright notice contained in any documentation reproduced without change by Company. For documentation which is reformatted or modified by Company, Company shall have the right to place only Company's own copyright notice on the reformatted or modified documentation. It is the intent of the parties that Company's copyright notice shall be interpreted to protect the underlying copyright rights of Supplier to the documentation to the extent such underlying rights are owned by Supplier.

ISO 9000 - Supplier recognizes that Company's Atlanta Works is an ISO 9000 registered supplier of goods and services, and that in order for Company to be so registered, Supplier must comply with and hereby agrees to comply with the

YOFC0011
CONFIDENTIAL



12/2/11

Case 1:04-cv-01879-CC Document 35 Filed 08/02/2005 Page 33 of 42



pro isions of this clause. Therefore, under this Agreement, Supplier shall have the portion of Supplier's quality system that applies to the Material and services cov red under this Agreement registered to the then current and applicable ISO 9000 series. Supplier shall, prior to or upon execution of this Agreement, provide Company's Representative indicated below a copy of the appropriate certificate(s) of registration issued by such third party accredited registrar(s). Supplier shall also maintain such certificate(s) of registration through appropriate assessments by such third party accredited registrar(s) and provide to Company's Representative any applicable updated certificate(s) or notifications of failure to pass a surveillance or full registration audit. Notwithstanding any other provision of this Agreement, if Supplier fails, for any reason, to obtain or maintain or provide to Company such certificate(s) of registration as set forth above, Company shall have the right, and without any cost to or liability or obligation of Company, to terminate this Agreement and any outstanding orders placed under this Agreement, whether or not any such orders have been placed to fulfill an ISO 9000 customer obligation. Company's Representative for ISO 9000 purposes is: Mr. Roman Harmel, Materials Quality Engineering, Suite E120, 2000 Northeast Expressway, Norcross, GA 30071.

COUNTRY OF ORIGIN - Supplier agrees that, for all Material provided under this Agreement, it will list the country of origin of the goods, by comcode, or in the event that no comcode is provided, by other identifying number or symbol, on the shipping invoice.

DUTIES, TAXES, AND INSURANCE CONTRIBUTIONS - All duties (including any export duties or fees), taxes, and all social insurance contributions arising out of or in connection with the Supplier's performance of the Agreement will be paid by Supplier. The parties agree that the prices or rates stated herein include all such charges and that such prices or rates will not be changed hereafter as a result of Supplier's failure to include therein any applicable duties, taxes or insurance contributions. Supplier shall indemnify and hold Company harmless from its failure to make such payment or contributions.

DUTY DRAWBACK - Company reserves the right to claim duty drawback on all purchases from Supplier and Supplier shall cooperate by providing the necessary Certificates of Delivery or, in instances where the imported merchandise received further processing, shall furnish Certificates of Manufacture and Delivery on all articles and merchandise which may be subject to drawback.

EXPORT CONTROL - Supplier will not use, distribute, transfer or transmit any products, software or technical information (even if incorporated into other products) provided under this Agreement except in compliance with U.S. export laws and regulations (the "Export Laws"). Supplier will not, directly or indirectly,

YOFC0012
CONFIDENTIAL

export or re-export the following items to any country which is in the then current list of prohibited countries specified in the applicable Export Laws:(a) software or technical data disclosed or provided to Supplier by Company or Company's subsidiaries or affiliates; or (b) the direct product of such software or technical data. Supplier agrees to promptly inform Company in writing of any written authorization issued by the U.S. Department of Commerce office of export licensing to export or re-export any such items referenced in (a) or (b). The obligations stated above in this clause will survive the expiration, cancellation or termination of this Agreement or any other related agreement.

OZONE DEPLETING SUBSTANCES - Supplier hereby warrants that it is aware of international agreements and pending legislation in several nations, including the United States, which would limit, ban and/or tax importation of any product containing, or produced using ozone depleting substances ("ODSs"), including chlorofluorocarbons, halons and certain chlorinated solvents. Supplier hereby warrants that the Material furnished to Company will conform to all applicable requirements established pursuant to such agreements, legislation and regulations, and the Material furnished to Company will be able to be imported and used lawfully (and without additional taxes associated with ODSs not reported to Company by Supplier as set forth in this clause) under all such agreements, legislation and requirements. Supplier also warrants that it is currently reducing, or if Supplier is not the manufacturer of the Material, is currently causing the manufacturing vendor to reduce and will, in an expeditious manner, eliminate, or, as applicable, have its manufacturing vendor eliminate the use of ODSs in the manufacture of the Material.

If the Material furnished by Supplier under this Agreement is manufactured outside the United States, Supplier shall, upon execution of this Agreement, and at any time that new products are added to this Agreement or changes are made to the Material furnished under this Agreement, complete, sign and return to Company the attached ODS Content Certification. The ODS Content Certification must be signed by Supplier's facility manager, corporate officer or his delegate.

The term "ODS content" on the ODS Content Certification means the total pounds of ODS used directly in the manufacture of each unit of Material. This includes all ODSs used in the manufacturing and assembly operations for the Material plus all ODSs used by Supplier's vendors and any other vendors in producing components or other products incorporated into the Material sold to Company.

Supplier is responsible to obtain information on the ODS content of all components and other products acquired to manufacture the Material and to incorporate such information into the total ODS content reported to Company;

YOFC0013
CONFIDENTIAL

provided however, that Supplier should not include in the ODS content those components or other products which are manufactured in the United States. Supplier hereby warrants to Company that all information furnished by Supplier on the ODS Content Certification is complete and accurate and that Company may rely on such information for any purpose, including but not limited to providing reports to government agencies or otherwise complying with applicable laws. Supplier shall cooperate with Company in responding to any inquiry concerning the use of ODSs to manufacture the Material or components thereof and to execute without additional charge any documents reasonably required to certify the absence or quantity of ODSs used to manufacture the Material or components thereof.

OZONE DEPLETING SUBSTANCES LABELING - Supplier warrants and certifies that all products, including packaging and packaging components, provided to Company under this Agreement have been accurately labeled, in accordance with the requirements of 40 CFR Part 82 entitled "Protection of Stratospheric Ozone, Subpart E - The Labeling of Products Using Ozone Depleting Substances." As of the execution of this Agreement, Material provided hereunder is exempt from these labeling requirements. If such exemption status changes, Company shall notify Supplier.

SEVERABILITY - If any of the provisions of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not invalidate or render unenforceable this entire Agreement, but rather this entire Agreement shall be construed as if not containing the particular invalid or unenforceable provision or provisions, and the rights and obligations of the parties shall be construed and enforced accordingly.

COMPLIANCE WITH UNITED STATES CUSTOMS LAWS AND REGULATIONS -Supplier shall ensure that its activities in performance of this Agreement shall not put Company in violation of any United States Customs laws, statutes, or regulations. Supplier agrees to assist Company in every way necessary to

YOFC0014
CONFIDENTIAL

Case 1:04-cv-01879-CC Document 35 Filed 08/02/2005 Page 38 of 42



ensure that Company can import the Material into the United States in accordance with all United States Customs laws, statutes, and regulations.

This Agreement shall be written in English, with two originals (one for each party). This Agreement shall come into effect immediately upon signing by both parties.

AGREED:

| YANGTZE OPTICAL FIBER AND CABLE CO., LTD. | LUCENT TECHNOLOGIES INC. |
| --- | --- |
| By [signature] (Signature) | By [signature] (Signature) |
| Name 徐锡洲 | Name [illegible] |
| Title General Manager | Title [illegible] |
| Date Feb 3, 2001 | Date Jan 26, 01 |

YOFC0015
CONFIDENTIAL

Case 1:04-cv-01879-CC Document 35 Filed 08/02/2005 Page 37 of 42

RECEIPT #
AMOUNT $ 150
SUMMONS ISSUED 1-1
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE 9-29-03

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| YANGTZE OPTICAL FIBRE AND CABLE COMPANY LTD., Plaintiff, v. LUCENT TECHNOLOGIES INC., Defendant. | CIVIL ACTION NO. ____________ |

03 CV 11413 EFH

MAGISTRATE JUDGE Bowler

**COMPLAINT**

For its complaint against defendant Lucent Technologies Inc. ("Lucent"), plaintiff Yangtze Optical Fibre and Cable Company Ltd. ("YOFC"), by its attorneys, alleges as follows:

**Statement of the Case**

1. This is an action for damages for Lucent's breach of a contract for its purchase from YOFC of certain minimum quantities of optical fiber during the period 2001 through 2003. YOFC seeks to recover its lost profits and other damages resulting from Lucent's failure and refusal to make purchases in accordance with its obligations under the contract.

**Parties**

2. YOFC is a corporation organized and existing under the laws of the People's Republic of China, with its principal place of business located in Wuhan, China. YOFC is a manufacturer of optical fiber and cable products.

3. Lucent is a corporation organized and existing under the laws of Delaware, with its principal place of business located in Murray Hill, New Jersey. Lucent has been registered

PLAINTIFF'S EXHIBIT C

since 1995 as a foreign corporation qualified to do business in Massachusetts and maintains a usual place of business in North Andover, Massachusetts.

**Jurisdiction and Venue**

4. This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2) in that the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs and is between a citizen of a state and a citizen of a foreign state.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) in that Lucent resides in this district.

**Claim for Relief**

6. On or about February 9, 2001 YOFC and Lucent entered into a contract in writing (the "Supply Agreement") that provides for YOFC to sell, and Lucent to purchase, quantities of 62.5 micron multimode optical fiber of YOFC's manufacture (the "Fiber") during the period 2001 through 2003. (A copy of the Supply Agreement, without Attachments A, B and C, is annexed to this complaint as Exhibit A.) The Supply Agreement was amended (the "Amendment") on March 19, 2001. (A copy of the Amendment is annexed to this complaint as Exhibit B.) At the time the Supply Agreement was entered into, worldwide demand for Fiber and similar materials was very strong and supply was limited.

7. The Supply Agreement provides that Lucent "commits to purchase from" YOFC a minimum quantity of 100,000 kilometers of Fiber in each of calendar years 2001, 2002, and 2003.

8. The sales price for Fiber under the Supply Agreement as originally executed was $108.00 per kilometer, subject to potential adjustment in accordance with provisions entitled "BEST PRICE" and "PRICE REVISION." The Amendment modified the "PRICE" provision in

the Supply Agreement to reduce the sales price to $100.75 per kilometer, effective March 26, 2001.

9. Pursuant to the Supply Agreement, Lucent purchased and accepted delivery of approximately 52,000 kilometers of Fiber during the period January through July 2001.

10. In July 2001 Lucent informed YOFC that Lucent wished to postpone scheduled deliveries of Fiber for the months of August and September 2001. YOFC agreed to postpone those deliveries until later in 2001.

11. In August 2001 Lucent informed YOFC that Lucent wished to postpone all further deliveries of Fiber under the Supply Agreement until 2002, citing a decline in global demand. YOFC did not agree to this request. Indeed by letter dated August 30, 2001 YOFC informed Lucent that YOFC regarded Lucent's conduct as a breach of the Supply Agreement.

12. On or about October 11, 2001 Lucent wrote YOFC, informing it that Lucent had agreed to sell its Optical Fiber Solutions ("OFS") business (for which Lucent had been purchasing the Fiber from YOFC) to the Furukawa Electric Co., Ltd. ("Furukawa") and requesting that YOFC consent to an assignment of the Supply Agreement to Furukawa and/or any entity designated by Furukawa.

13. On November 6, 2001 YOFC wrote to Lucent, acknowledging Lucent's request for consent to assignment of the Supply Agreement and, in view of Lucent's ongoing failure to honor its purchase commitments and YOFC's unfamiliarity with the proposed assignee, requesting certain information that might aid YOFC in reaching a decision concerning Lucent's request. By November 23, 2001, having failed to receive the requested information, YOFC again wrote Lucent and reiterated its request. Lucent failed to respond to this request as well.

14. YOFC has never consented to assignment of the Supply Agreement.

15. By letter dated November 19, 2001, Walter Simmons, formerly Supply Chain Network Director of Lucent, informed YOFC that Lucent's sale of its OFS business had been completed and that that business would continue to be operated by two entities – OFS BrightWave, LLC and OFS Fitel, LLC (the "OFS Entities") – of which Mr. Simmons had become Director – Supply Chain Networks.

16. During the period November 2001 through May 2002 YOFC had intermittent discussions with Mr. Simmons regarding the Supply Agreement and the possibility that the OFS Entities, in lieu of Lucent, would purchase Fiber from YOFC in a manner that YOFC would accept in fulfillment of the Supply Agreement's purchase requirements. No agreement was reached concerning satisfaction of Lucent's unfulfilled obligations under the Supply Agreement, but OFS BrightWave, LLC did purchase from YOFC a total of approximately 14,000 kilometers of Fiber, in five shipments between December 2001 and May 2002, and YOFC agreed to treat the purchases as if made by Lucent under the Supply Agreement.

17. Including the OFS BrightWave LLC purchases, a total of 65,627 kilometers of Fiber has been purchased under the Supply Agreement, leaving a balance of 234,373 kilometers to be purchased in fulfillment of the minimum requirements provided for therein.

18. Lucent has failed and refused to fulfill the remaining purchase requirements under the Supply Agreement and has thereby committed a breach of the Supply Agreement.

19. As a consequence of Lucent's breach of the Supply Agreement, YOFC has suffered damages, including lost profits and impairment of good will, in an amount that exceeds $15 million.

**Request for Relief**

WHEREFORE, YOFC requests that the court:

1. Enter judgment in its favor against Lucent for all damages it has sustained as a result of Lucent's breach of the Supply Agreement and failure to fulfill its minimum purchase requirements thereunder, together with interest and costs; and

2. Grant YOFC such other and further relief as the court deems just.

YANGTZE OPTICAL FIBRE AND
CABLE COMPANY LTD.

By its attorneys,

July 29, 2003

Ira K. Gross (BBO# 212720)
Samual A. Miller (BBO# 648568)
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, Massachusetts 02109
(617) 338-2800

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-4 P 4: 37

| | |
|---|---|
| YANGTZE OPTICAL FIBRE AND CABLE COMPANY LTD., Plaintiff, v. LUCENT TECHNOLOGIES INC., Defendant. | CIVIL ACTION NO. 03 CV 11413 EFH |

**PLAINTIFF YANGTZE OPTICAL FIBRE AND CABLE COMPANY LTD.'S STATEMENT PURSUANT TO LOCAL RULE 7.3**

Pursuant to LR. 7.3, plaintiff Yangtze Optical Fibre and Cable Company Ltd. ("YOFC") hereby identifies the following publicly held company that owns 10% or more of YOFC's stock:

**Draka Holding N.V.**

Respectfully submitted,

YANGTZE OPTICAL FIBRE AND
CABLE COMPANY LTD.

By its attorneys,

August 4, 2003

Ira K. Gross (BBO# 212720)
Samual A. Miller (BBO# 648568)
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, Massachusetts 02109
(617) 338-2800